## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

RODERICK ZAVALA (K-68842),

    Plaintiff,

        v.

GHALIAH OBAISI, INDEPENDENT
EXECUTOR OF THE ESTATE OF
SALEH OBAISI, and WEXFORD
HEALTH SOURCES, INC.,

    Defendants.

Case No. 17-cv-03042

Judge Martha M. Pacold

## MEMORANDUM OPINION AND ORDER

Plaintiff Roderick Zavala, a prisoner at Stateville Correctional Center, injured his hand while working at the prison. Zavala brought this suit under 42 U.S.C. § 1983, alleging that his post-surgery medical treatment was constitutionally deficient. Defendants Obaisi and Wexford move to exclude Zavala's expert witness. [130]. Each defendant separately moves for summary judgment. [122], [126]. For the following reasons, defendants' *Daubert* motion [130] is denied, Obaisi's motion for summary judgment [122] is granted in part and denied in part, and Wexford's motion for summary judgment [126] is granted.

### Background

The court views the following facts, which are undisputed unless otherwise noted, in the light most favorable to Zavala. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

At all times relevant to this suit, Zavala has been a prisoner at Stateville. *See* OSOF, [124] ¶ 1.[1] Wexford is a private corporation that contracts with the

---

[1] Bracketed numbers refer to docket entries and are followed by the page or paragraph number. Page numbers refer to the CM/ECF page number. Citations to the parties' Local Rule 56.1 Statements of Fact are identified as follows: "OSOF" for Obaisi's Statement of Facts, [124]; "WSOF" for Wexford's Statement of Facts, [128]; "ZSOF" for Zavala's Statement of Additional Facts, [159] § III at 24–30 and [162] § III at 16–23; "Z's Resp. WSOF" for Zavala's response to Wexford's Statement of Facts, [162] § II at 2–16; "Z's Resp.

Illinois Department of Corrections (IDOC) to provide medical treatment at Stateville. WSOF, [128] ¶ 2. Defendant Ghaliah Obaisi is the Independent Executor of the Estate of Dr. Saleh Obaisi and was substituted as a party for Dr. Obaisi after Dr. Obaisi's death in December 2017. [66] at 1 n.1 (citing [30], [35]). Dr. Obaisi "served as Stateville's Medical Director from August 2012 until his death in December 2017." *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 957 (7th Cir. 2019).

On November 1, 2016, Zavala severely crushed his left hand and fingers in a soap machine while working at Stateville's "soap shop," an onsite soap factory inside the prison. OSOF, [124] ¶¶ 4–7. Zavala sustained multiple finger fractures, complete transection (cutting) of certain sensory nerves causing loss of sensation, and injuries to soft tissue, blood vessels, artery vascular structure, and tendons. OSOF, [124] ¶ 9. That day, Zavala was taken to St. Joseph's Medical Center for evaluation and then transferred to Loyola University Medical Center for further treatment. OSOF, [124] ¶¶ 10–11.

On November 2, Dr. Norman Weinzweig performed surgery at Loyola to repair Zavala's injuries. OSOF, [124] ¶ 12. Dr. Weinzweig was able to repair Zavala's "ulnar slipped tendon" and testified that he "achieved whatever could be achieved during surgery." Z's Resp. OSOF, [159] ¶ 15. The next day, November 3, Dr. Weinzweig discharged Zavala with prescriptions for antibiotics (to prevent infection) and Norco (for pain) and asked for a follow-up in one week. OSOF, [124] ¶ 17. Dr. Weinzweig gave Zavala a temporary splint to wear and recommended that a custom, thermoplastic (specialized, individually fabricated) splint be ordered. OSOF, [124] ¶¶ 17, 27.

Dr. Obaisi participated in Wexford's "collegial review" process for approving outside referrals. Z's Resp OSOF, [159] ¶ 18; ZSOF, [162] ¶17. On November 7, 2016, Dr. Obaisi requested approval for all follow-up visits with Dr. Weinzweig through January 31, 2017, and Wexford approved that request. OSOF, [124] ¶ 21.

On November 9, 2016, Zavala returned to see Dr. Weinzweig for a post-operative visit. WSOF, [128] ¶ 41. At this visit, Dr. Weinzweig reiterated that Zavala needed a thermoplastic splint and ordered that Zavala return to the clinic for a follow-up appointment in two weeks. WSOF, [128] ¶ 18. Dr. Weinzweig also

---

OSOF" for Zavala's response to Obaisi's Statement of Facts, [159] § II at 2–24; and "O's Resp. ZSOF" for Obaisi's response to Zavala's Statement of Additional Facts, [176]. After seeking and receiving leave to amend their Statements of Facts to include citations with specificity, [167], [169], Obaisi and Wexford also each filed an Amended Statement of Facts, [173], [175], but the parties have neither cited nor relied on the amended statements. Accordingly, the court, like the parties, cites the original statements of fact where applicable.

ordered "complete compliance" with occupational therapy two to three times per week. Z's Resp. WSOF, [162] ¶ 58.

On November 14, 2016, Dr. Obaisi reviewed and signed his own annual performance evaluation, which noted that Dr. Obaisi's provision of "offsite care" was "over budget," and accordingly gave him a "[d]oes not meet expectations" grade for his ability to "control expenses, conserve supplies, and operate within budget." ZSOF, [162] ¶¶ 13–14. The next day, Dr. Obaisi discussed Zavala's occupational therapy during collegial review. ZSOF, [162] ¶ 19. He sought and received approval for only a single occupational therapy evaluation by a certified hand specialist—not the two to three sessions per week that Dr. Weinzweig had ordered. OSOF, [124] ¶ 50; ZSOF, [162] ¶ 19. Additionally, Zavala did not return to see Dr. Weinzweig until January 25, 2017, eleven weeks after the November 9, 2016 visit (as opposed to the two-week interval Dr. Weinzweig had ordered). ZSOF, [162] ¶ 26.

On December 9, 2016, Zavala had his single occupational therapy evaluation with Ms. Katherine Southworth. OSOF, [124] ¶ 50. Ms. Southworth recommended therapy two to three times per week and gave Zavala a home exercise program to complete at Stateville. OSOF, [124] ¶ 51; O's Resp. ZSOF, [176] ¶ 15; Z's Resp. WSOF [162] ¶ 55. Ms. Southworth also fitted Zavala with a preliminary brace after Zavala's delay in beginning therapy. OSOF, [124] ¶ 51; O's Resp. ZSOF, [176] ¶ 15. On December 27, 2016 (eight weeks after surgery, and eighteen days after visiting Ms. Southworth), Zavala began therapy with Mr. Jose Becerra, a physical therapist (not an occupational therapist) at Stateville. Z's Resp. OSOF, [159] ¶ 52.

Dr. Obaisi ordered Zavala a thermoplastic splint. OSOF, [124] ¶ 30.[2] However, on November 22, 2016, Dr. Obaisi received notice that Zavala was not permitted to have this splint for security reasons—at least not outside the infirmary. OSOF, [124] ¶¶ 29–31; Z's Resp. OSOF, [159] ¶¶ 29–31. The parties dispute whether Zavala would have been allowed to use the thermoplastic splint in the infirmary. Defendants contend that Dr. Obaisi unsuccessfully attempted to have IDOC let Zavala use the thermoplastic splint in the infirmary. OSOF, [124] ¶ 35. But there is testimony in the record indicating that Zavala would have been allowed to use the thermoplastic splint there. *See* [128] Exh. 7 at 35 (sealed);[3] Z's Resp. OSOF, [159] ¶ 31. In any case, the parties agree that no one informed Zavala that the splint arrived or that he was permitted to wear it inside the infirmary. OSOF, [124] ¶ 34; Z's Resp. OSOF, [159] ¶ 18. Six weeks later, on January 3, 2017,

---

[2] The record does not make clear when this splint was ordered.

[3] When the court refers to a sealed document, it attempts to do so without revealing any information that could reasonably be deemed confidential. The court discusses information from these documents only to the extent necessary to explain the path of the court's reasoning. *See Union Oil Co. of Cal. v. Leavell*, 220 F.3d 562, 568 (7th Cir. 2000).

Dr. Obaisi ordered a security-compliant (but not thermoplastic) brace.[4]  OSOF, [124] ¶ 33; Z's Resp. OSOF, [159] ¶ 33.

Wexford's policies state that dressings for a laceration involving tendons and nerves should be changed every six hours.  ZSOF, [162] ¶ 16.  The parties agree that at a minimum, Zavala's dressings were not changed between November 9 and December 9.  ZSOF, [162] ¶ 32; O's Resp. ZSOF, [176] ¶ 27.  Additionally, Zavala's sutures were not removed until December 27, eight weeks after surgery, by Stateville physician Dr. Aguinaldo.  ZSOF, [162] ¶ 33; Z's Resp. OSOF [159] ¶ 70.

Zavala submitted to IDOC a series of grievances about these delays and also raised with Dr. Obaisi various aspects of the course of post-surgical treatment detailed above.  On November 21, 2016, Zavala wrote to Dr. Obaisi:

> Every time I move my hand, I can feel a burning sting in my fingers from the stitches. I can feel the pain from under the skin, inside my fingers. Also, my fingers are feeling more stiff and unmovable. I should have went out last week to see a certified hand therapist. I am supposed to go back to [L]oyola for follow up this week. My fingers hurt bad; please see me and let me know something.

ZSOF, [159] ¶ 33.  A week later, on November 28, Zavala wrote to Dr. Obaisi again: "I can't take this pain any longer.  Please send me out to see the Surgeon, or the certified hand therapist.  My fingers hurt bad from these stitches. . . .  My fingers are numb, and feel frozen stiff."  ZSOF, [159] ¶ 34.  On December 1, Zavala wrote in a grievance filed with IDOC:

> I . . . have not been sent to see Dr. Weinzweig for further follow-up care. My stitches, nor bandages, have not been removed.  My wounds have not been cleaned. It has been 1 month since my surgery and I can feel the pain of the stitches in my fingers every time I move my hand.  My fingers have become frozen stiff, and the pain is excruciating.  I fear that if I am not seen by a certified hand therapist my fingers will become stuck in the upright position, and my hand strength will become useless.

ZSOF, [162] ¶ 31.  In his deposition, Zavala testified that he showed his wound to Dr. Obaisi on December 21 and asked Dr. Obaisi "why wouldn't he send me out to see a certified hand therapist," to which Dr. Obasi replied, "I know you need therapy, but I can't send you out."  [148] at 32 (sealed); ZSOF, [162] ¶ 30.  And on

---

[4] The record is not clear as to whether Zavala received or Dr. Obaisi ordered the security compliant brace on January 3.  Compare Z's Resp. OSOF [159] ¶ 18 (ordered) with *id.* at ¶ 33 (received).  Construing the record in the light most favorable to Zavala, the nonmovant, the court assumes that the brace was ordered on January 3.

December 28, Zavala submitted another grievance to IDOC that recited recent conversations with Dr. Obaisi, Mr. Becerra, and Dr. Aguinaldo. ZSOF, [162] ¶ 34.[5]

On March 3, 2017, Dr. Weinzweig charted that Zavala was doing well, but had diminished range of motion and stiffness, and was developing a contracture in four fingers. ZSOF, [159] ¶ 38. On April 26, Zavala had little ability to flex at least one finger, had contractures in at least one finger, and could "potentially injure flexor tendons esp LRF[6] with worsening of patient's function." O's Resp. ZSOF, [176] ¶ 39; *see also* ZSOF, [159] ¶ 39.

Zavala filed suit in 2017, bringing individual claims against Dr. Obaisi and two individual IDOC defendants (Warden Randy Pfister and Corrections Officer Mark Damon) and a *Monell* claim against Wexford. [1]. Wexford moved to dismiss the *Monell* claim [42]; the court denied that motion. [66]. Zavala and the IDOC defendants settled their claims. Defendants Obaisi and Wexford now move to exclude Zavala's expert witness. [130]. Each defendant separately moves for summary judgment. [122], [126].

## Discussion

## I.  **Defendants' *Daubert* Motion**

The court begins with defendants' motion to bar Zavala's expert witness, Dr. Seth Levitz. [130]. "The admission of expert testimony is governed by Federal Rule of Evidence 702 and the principles outlined in *Daubert* [*v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)]." *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011). Rule 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge

---

[5] When Zavala first filed this case, there was some indication that he may have filed additional IDOC grievances on November 10 and November 28. *See* [6] at 2–3. However, Zavala does not allege that IDOC grievances were filed on these dates in any of his summary judgment briefs or statements of fact, nor do copies of these grievances appear in Zavala's list of exhibits. *See* [159] at 31. The court was able to locate copies of these two grievances elsewhere in the record, *see* [32-8], [32-10], and it appears that these grievances concerned only the accident itself and the management of the soap machine workstation; the grievances did not concern Zavala's post-accident medical care. In any case, there is no evidence in the record from which a reasonable trier of fact could conclude that Zavala filed grievances related to his medical care with the IDOC on either November 10 or November 28.

[6] "LRF" may stand for "left ring finger," but the record does not make clear the meaning of this acronym.

5

will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Before admitting expert testimony, the court must determine whether the proposed testimony is relevant and reliable. *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). This requires a three-step analysis. *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007).

First, "the witness must be qualified 'as an expert by knowledge, skill, experience, training, or education.'" *Id.* (quoting Fed. R. Evid. 702). "Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) (quoting *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990)).

Second, the expert's reasoning or methodology must be scientifically reliable. *Ervin*, 492 F.3d at 904. District courts have broad latitude when deciding whether an expert's testimony is reliable. *Bryant v. City of Chicago*, 200 F.3d 1092, 1098 (7th Cir. 2000). *Daubert* set forth the following nonexhaustive factors that may be pertinent for determining reliability: "1) 'whether [the expert's theory] can be (and has been) tested'; 2) 'whether the theory or technique has been subjected to peer review and publication'; 3) 'the known or potential rate of error'; and 4) 'general acceptance' among the relevant scientific community." *Smith*, 215 F.3d at 719 (quoting *Daubert*, 509 U.S. at 593–94) (alterations in *Smith*); *see also Timm v. Goodyear Dunlop Tires N. Am., Ltd.*, 932 F.3d 986, 993 (7th Cir. 2019).

Third, the testimony must be relevant; that is, it must assist the trier of fact in understanding the evidence or determining a fact at issue. *Ervin*, 492 F.3d at 904.

While the district court serves as a "gatekeeper," it must be mindful that "the key to the gate is not the ultimate correctness of the expert's conclusions," but "the soundness and care with which the expert arrived at her opinion." *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013). The party offering expert testimony bears the burden of proving by a preponderance of the evidence that the testimony satisfies Rule 702. *Lewis v. CITGO Petrol. Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). Determinations on admissibility, however, "should not supplant the adversarial process; 'shaky' expert testimony may be admissible, assailable by its opponents through cross-examination." *Gayton*, 593 F.3d at 616.

Zavala hired Dr. Levitz, an orthopedic surgeon specializing in hand and upper extremity surgery, to provide expert testimony about Zavala's condition and treatment. In preparing his expert report, Dr. Levitz reviewed (1) Zavala's medical records; (2) outpatient therapy notes from Ms. Katherine Southworth; (3) Wexford Health Orthopedic Surgery Guidelines; (4) Zavala's Stateville grievances; (5) Zavala's letters to Dr. Obaisi and Stateville's Warden; (6) Stateville's November 1, 2016 incident reports; and (7) deposition transcripts of Zavala, Dr. Weinzweig, and Dr. Arthur Funk, Wexford's Rule 30(b)(6) corporate representative. *See* [154] at 5, [155] at 5–6.

In the *Daubert* motion, [130] at 2–3, defendants challenge the following three opinions from Dr. Levitz's report: (1) If Zavala had worked with an occupational hand therapist (which differs from a physical therapist), he "likely would have received additional treatments during the therapy program, including splinting, that would have given him a better chance of achieving a more functional outcome." [154] at 4 (sealed). (2) Delays in Zavala's care "increased the likelihood of the patient experiencing more stiffness in the fingers, loss of motion/strength in the hand, and ultimately loss of function in the hand." [154] at 4. (3) "After an injury of this nature, it would be expected that a patient may have functional limitations due to stiffness, sensitivity, and weakness. However, with proper wound care, pain control, splinting, and therapy, these limitations can be minimized, giving the patient the best opportunity for having a successful recovery. It is in my opinion that given the delay in treatment, the likelihood of Mr. Zavala having a successful surgical outcome was decreased. These functional limitations are likely to be permanent for Mr. Zavala." [154] at 5.

Defendants do not challenge Dr. Levitz's qualifications. *See* [165] at 3; [174] at 2. Instead, they primarily challenge the reliability of Dr. Levitz's opinions. Their chief contention is that Dr. Levitz's failure to conduct an independent examination of Zavala renders his opinions unreliable, since Dr. Levitz could only have "speculated on [the] documents provided to him" without using "any form of reliable methodology that he uses on his own patients." [130] at 6. Defendants contend that Dr. Levitz wanted to conduct an examination but was informed by plaintiff's counsel that he could not do so. [130] at 6.

To the extent defendants are attacking the factual basis for Dr. Levitz's testimony, they have provided no reason to exclude Dr. Levitz's testimony. It is undisputed that Dr. Levitz reviewed a wide range of sources, such as medical records, incident reports, and outpatient therapy notes, and defendants have not challenged the accuracy of those sources. Moreover, Dr. Levitz's reliance in part on Zavala's own description of his functional losses "goes to the weight of the medical testimony, not its admissibility," and is "susceptible to exploration by cross-examination by opposing counsel." *Cooper v. Carl A. Nelson & Co.*, 211 F.3d 1008, 1021 (7th Cir. 2000) (medical expert could properly testify to the cause of injury

based in part on the patient's statements, and the jury could evaluate the patient's credibility); *see also Walker v. Soo Line R. Co.*, 208 F.3d 581, 586 (7th Cir. 2000) ("In situations in which a medical expert has relied upon a patient's self-reported history and that history is found to be inaccurate, district courts usually should allow those inaccuracies in that history to be explored through cross-examination.").

To the extent defendants argue that drawing conclusions from a paper record rather than a firsthand examination is methodologically unsound, that argument is not persuasive. Dr. Levitz's review of medical records and the other records listed above is enough to support his opinions here. *Walker*, 208 F.3d at 591 ("The lack of an examination of Mr. Walker does not render Dr. Upton's testimony inadmissible."); *Rabin v. Cook Cty.*, No. 09-cv-08049, 2015 WL 1926420, at *3 (N.D. Ill. Apr. 27, 2015) ("[T]he Seventh Circuit has held that evaluating a patient's medical records alone—without performing a physical examination—is a reliable method to use when developing an expert opinion.") (citing cases).

Indeed, Dr. Levitz testified that "at this point," Zavala's description of his functional limitations is a more valuable source of information than the results of a functional capacity evaluation: "So I can measure his motion, I can measure his strength, but it's him using the hand and how he feels limited. That's really what matters. And the information that I had taken from his deposition where those things were asked of him is much more important at this point in time." [155] at 11 (sealed).

Dr. Levitz relied on the record, including Zavala's description of his functional losses, and concluded—based on his professional experience and education—that different treatment by Dr. Obaisi would have reduced the likelihood of such functional losses. There is nothing inherently unsound or unreliable about this methodology. Defendants' points that Dr. Levitz trusted Zavala's description of his experience and did not conduct an independent functional evaluation or examination, and that an independent examination would be important, are matters for cross-examination.

Defendants insist that Dr. Levitz's approach in this case did not adhere to his own standards of practice. As defendants point out, Dr. Levitz acknowledged that in-person functional capacity evaluations are generally important and testified that if Zavala was his patient, Dr. Levitz would have performed measurements and testing. *See* [155] at 39 (sealed). Accordingly, defendants argue that Dr. Levitz's approach was "a methodology designed by Dr. Levitz specifically for this litigation." [130] at 8. However, in addition to the testimony about the relatively greater importance of self-reported functional losses, Dr. Levitz also testified that physicians often "don't do functional capacity evaluations" because of their cost, and that physicians "can get a pretty good idea of where the patient stands" from medical records and patient complaints. [155] at 12, 43 (sealed). Again, defendants

are free to explore these matters on cross-examination, but they do not render the testimony so unreliable that it should be barred.

Defendants also take aim at Dr. Levitz's reliance on his "flexor tendon protocols," which are his guideposts for post-operative rehabilitation. Defendants argue Dr. Levitz never personally used these protocols on Zavala. That argument is not persuasive. Dr. Levitz relied on his knowledge of his own protocols as a cross-reference against Zavala's treatment. Defendants also argue Dr. Levitz's own protocols were not published or peer-reviewed, but Dr. Levitz testified that they were substantially similar to the main generally accepted protocols in the medical community. *See* [155] at 7–8 (sealed). Defendants have presented no evidence that Dr. Levitz's protocols lack "general acceptance" in the medical community or are not rooted in peer-reviewed or published research. *Smith*, 215 F.3d at 719. Dr. Levitz also can properly rely on his professional experience with the effect that treatment adhering to these protocols tends to have on patients' results. *See Cage v. City of Chicago*, 979 F. Supp. 2d 787, 803 (N.D. Ill. 2013) ("expert testimony is not unreliable simply because it is founded on [the expert's] experience rather than on data") (quoting *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010)) (alteration omitted).

Next, defendants argue that because Dr. Levitz relied in part on the testimony of Dr. Weinzweig, the treating physician, the fact that Dr. Levitz and Dr. Weinzweig reached potentially divergent conclusions indicates unreliability. Defendants' position is that "[s]ince Dr. Levitz is basing his opinions off of Dr. Weinzweig's testimony, it would only make sense that his opinions would mirror those of Dr. Weinzweig." [130] at 11. But it makes sense that Dr. Levitz's conclusions could differ in certain ways, since medical experts rely on their own professional experience. "That two different experts reach opposing conclusions from the same information does not render their opinions inadmissible." *Walker*, 208 F.3d at 589.

In any event, it is not clear that Dr. Weinzweig and Dr. Levitz reached opposing conclusions. Dr. Weinzweig concluded that therapy or no therapy, Zavala's outcome was "excellent," and patients with adequate therapy often do not achieve such good results. O's Resp. ZSOF, [176] ¶ 19. Dr. Levitz said, "I'm not debating that [Zavala] got an excellent outcome." [155] at 33 (sealed). And Dr. Levitz acknowledged that Dr. Weinzweig did not attribute any functional limitations to delays in treatment. [155] at 33 (sealed). However, Dr. Levitz testified that delays "cut down" the likelihood of a "maximal outcome." [155] at 27 (sealed). Since "therapy programs work," timely therapy "may have given [Zavala] a better chance of minimizing those functional losses." [155] at 32 (sealed). Based on the record, including Dr. Weinzweig's assessment, Dr. Levitz opined that Zavala "did not have full motion and clearly does not have full function. And if there were

other things that could been done to get the patient to that point, then all of those things should have been done." [155] at 27 (sealed).

Moving on from reliability, defendants argue that Dr. Levitz's opinions are not helpful to the trier of fact. They contend Dr. Levitz's testimony is confusing since as noted above he did not disagree with Dr. Weinzweig's conclusion that Zavala got an excellent outcome. But competing expert witnesses are permitted to agree on some points but not others. Our adversarial system presumes that juries are capable of weighing expert testimony with different emphases. *See Gicla v. United States*, 572 F.3d 407, 414 (7th Cir. 2009) (noting the case involved "a classic battle of the experts . . . [that] called upon the factfinder to determine what weight and credibility to give to each expert").

Defendants also assert, without elaboration, that Dr. Levitz's testimony is impermissibly speculative. But Dr. Levitz's testimony that different care would have reduced Zavala's likelihood of prolonged pain and permanent functional loss was properly based on his experience and education.

Finally, defendants argue that Dr. Levitz's opinions have low probative value which is "far outweighed by the unfair prejudicial effect on Dr. Weinzweig and his expert testimony." [130] at 11. Defendants do not elaborate on how the testimony prejudices Dr. Weinzweig in an "unfair" way, so any argument on this front is waived. *See Hernandez v. Cook Cty. Sheriff's Office*, 634 F.3d 906, 913 (7th Cir. 2011) ("It is well established in our precedent that 'skeletal' arguments may be properly treated as waived."). Defendants' *Daubert* motion is denied.

## II. Defendants' Motions for Summary Judgment

Obaisi and Wexford filed separate motions for summary judgment.

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls which facts are material. *Id.*

The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex*, 477 U.S. at 323 (1986). After a "properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quotation marks and citation omitted). Construing the evidence and facts supported by the record in favor of the

nonmoving party, the court gives the nonmoving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in [its] favor." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016) (citations omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id.* (citation omitted).

Defendants seek summary judgment on Eighth Amendment claims. The Eighth Amendment protects prisoners from conditions of confinement that "involve the wanton and unnecessary infliction of pain." *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981). This protection extends to the denial or delay of medical care. *Estelle v. Gamble*, 429 U.S. 97, 103–05 (1976). To establish a violation of this right, a plaintiff must show that he had "an objectively serious medical condition"; the defendants knew of the condition and were "deliberately, that is subjectively, indifferent" to it; and this indifference caused the plaintiff injury. *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 661–62 (7th Cir. 2016) (citation and quotation marks omitted); *see also Quillman v. Estate of Obaisi*, No. 14-cv-9806, 2020 WL 2084989, at *4 (N.D. Ill. Apr. 30, 2020).

"A delay in treating non-life-threatening but painful conditions may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." *Arnett v. Webster*, 658 F.3d 742, 753 (7th Cir. 2011). "[T]he length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment." *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010). In cases such as this one, where plaintiff alleges that the defendant delayed, rather than denied, medical treatment, the plaintiff must "present 'verifying medical evidence' that the delay, and not the underlying condition, caused some harm." *Walker*, 940 F.3d at 964 (quoting *Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013)).

The court addresses Obaisi's motion first, followed by Wexford's.

## A.    Obaisi's Summary Judgment Motion

Zavala alleges that Dr. Obaisi acted with deliberate indifference to his serious medical needs by failing to provide Zavala with access to timely and adequate therapy, timely follow-up visits with Dr. Weinzweig, timely and adequate splinting, and wound care (such as removing sutures and changing dressings). [161] at 6. Obaisi, the executor of Dr. Obaisi's estate, denies these allegations and argues that Zavala cannot establish any of the elements of an Eighth Amendment

11

claim—objective seriousness, deliberate indifference, or causation.[7]  Obaisi also argues that punitive damages are not available against the estate.

### 1.    Objective Seriousness

Regarding the first element of an Eighth Amendment claim, Obaisi argues that Zavala's post-operative condition was not "objectively serious," because Dr. Weinzweig was able to treat most of Zavala's injuries during the November 2, 2016, surgery.  This argument is foreclosed by Seventh Circuit precedent.  Zavala's post-operative condition was diagnosed by physicians as "mandating treatment," *see* [124] ¶ 17, which is enough to survive a motion for summary judgment.  *See Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020); *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005).  Further, Dr. Weinzweig's post-operative treatment instructions—which included prescriptions for painkillers, regular therapy, and a splint—foreclose summary judgment on this point.

### 2.    Deliberate Indifference and Causation

Obaisi next argues that the record cannot support Zavala's claims that Dr. Obaisi was deliberately indifferent to Zavala's medical needs and that Dr. Obaisi's inaction or delays (rather than the underlying condition itself) harmed Zavala.  As explained below, however, there is enough evidence in the record on both points— indifference and causation—to survive summary judgment with respect to the delays in Zavala's therapy, follow-up appointment, splinting, and wound care.

#### a.    Delay in Therapy

The record contains sufficient evidence for a jury to conclude that Zavala's therapy was unreasonably delayed and that Dr. Obaisi was responsible for, and deliberately indifferent to, the delay in therapy.  As noted above, on November 9, 2016, Dr. Weinzweig ordered occupational therapy for Zavala's hand two to three times per week.  But Zavala did not consult with an occupational therapist until December 9, and did not begin therapy (with a physical therapist) for four additional weeks after that.

There is evidence in the record that would allow a jury to conclude that Dr. Obaisi was responsible for this delay.  It is undisputed that Dr. Obaisi was aware of Zavala's surgery and need for follow-up care generally; Dr. Obaisi participated in the "collegial review" process that had at least some responsibility for carrying out

---

[7] A section of Obaisi's brief is devoted to arguing that the decision to prescribe Tylenol 3, as opposed to Norco, was not deliberate indifference.  The court has no occasion to address this argument, because Zavala has not alleged or argued (either in his complaint or in his response brief) that the substitution of Tylenol 3 for Norco injured him.

Dr. Weinzweig's post-surgical orders. Zavala wrote letters to Dr. Obaisi and medical grievances concerning Zavala's condition, serious pain, and need for treatment. But rather than receiving occupational therapy within ten to fourteen days after surgery as requested by Dr. Weinzweig, Zavala completed only physical therapy (not occupational therapy) and did not begin physical therapy until eight weeks after surgery. Zavala received only a single evaluation by a certified occupational therapist, and that evaluation did not take place until a month after Dr. Weinzweig ordered it.

There is also enough evidence to survive summary judgment on whether Dr. Obaisi was deliberately indifferent to the delay. Zavala testified that when he asked Dr. Obaisi for additional therapy, Dr. Obaisi replied, "I know you need therapy, but I can't send you out." ZSOF, [162] ¶ 30. Dr. Obaisi made this statement after receiving the "[d]oes not meet expectations" grade for his ability to "control expenses, conserve supplies, and operate within budget" on his annual performance evaluation. ZSOF, [162] ¶¶ 13–14. A jury could reasonably interpret this statement as an admission that Dr. Obaisi prioritized cost-saving to the "exclusion of reasonable medical judgment," and, as a result, conclude that Dr. Obaisi was deliberately indifferent to Zavala's therapeutic delays. *Roe v. Elyea*, 631 F.3d 843, 863 (7th Cir. 2011) ("Although administrative convenience and cost may be, in appropriate circumstances, *permissible factors* for correctional systems to consider in making treatment decisions, the Constitution is violated when they are considered *to the exclusion of reasonable medical judgment* about inmate health.") (emphases in original; citation omitted); *see also Petties v. Carter*, 836 F.3d 722, 730 (7th Cir. 2016), *as amended* (Aug. 25, 2016) ("If a prison doctor chooses an 'easier and less efficacious treatment' without exercising professional judgment, such a decision can also constitute deliberate indifference.") (citation omitted); *Arnett*, 658 F.3d at 753 ("Deliberate indifference can include the intentional delay in access to medical care.").

Defendants argue that Zavala has not presented evidence that Dr. Obaisi was personally responsible for any delays, deliberately refused to send Zavala offsite, or failed to do what he personally could have. Defendants argue, for example, that Zavala did not present evidence that Dr. Obaisi was personally responsible not just for medical evaluations of patients but also for scheduling offsite appointments and / or coordinating security transport. [177] at 7. With respect to Ms. Southworth (the offsite occupational therapist), defendants argue that it is undisputed that Dr. Obaisi sought and obtained approval for that evaluation, that Zavala has presented no evidence that there was an available appointment with Ms. Southworth any sooner than it occurred, and that Zavala cannot show that Dr. Obaisi played a role in the date of that appointment. [177] at 4–5. Defendants are free to present these arguments to the jury, but at this stage the evidence of Dr. Obaisi's awareness of

Zavala's condition and participation in collegial review is enough to survive summary judgment.

The fact that Zavala eventually recovered much of his hand's functionality despite the delay in therapy does not preclude liability. *See Smith v. Knox Cnty. Jail*, 666 F.3d 1037, 1039–40 (7th Cir. 2012) (per curiam) ("deliberate indifference to prolonged, unnecessary pain can itself be the basis for an Eighth Amendment claim"); *Arnett*, 658 F.3d at 753 ("A delay in treating non-life-threatening but painful conditions may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain.") (citation omitted). Zavala's medical expert, Dr. Levitz, explained that failure to timely start a therapy program can cause recovery to be "significantly prolonged," and that this delay caused Zavala's rehabilitation to take seven months, when it should have taken no longer than three or four. [144] at 13 (sealed); Z's Resp. OSOF, [159] ¶ 71. Dr. Levitz further testified Zavala likely had "more scar formation, more swelling, more wound discomfort, greater risk of infection" because of the delay. [144] at 27 (sealed). A jury could conclude from this evidence that the delay in receiving timely therapy at a minimum prolonged Zavala's serious physical pain.

### b. Delay in Follow-Up Appointment

A jury also could find that Dr. Obaisi caused an unreasonable delay in Zavala's follow-up appointment with Dr. Weinzweig. As noted above, rather than Zavala having a follow-up appointment with Dr. Weinzweig within two weeks after the November 9 post-operative visit, the follow-up visit did not occur until eleven weeks after the post-operative visit. This is true even though Dr. Obaisi received approval from Wexford on November 9 (the day of the post-operative visit, and one week after surgery) to send Zavala out for follow-ups. This delay—like the delay in sending Zavala to therapy described above—came on the heels of Dr. Obaisi's annual performance review, in which he was criticized for spending too much money on patients' offsite care.

When viewed alongside the other delays and Dr. Obaisi's alleged admission to Zavala that Dr. Obaisi knew he needed care but would not send him out, a jury could conclude that this delay, too, was caused by Dr. Obaisi's deliberate indifference. That is particularly true given that Obaisi has not presented evidence that shows an alternate cause for the delay. *Cf. Walker*, 940 F.3d at 965 (finding no evidence of deliberate indifference where Dr. Obaisi delayed treatment because he was waiting on further test results).

There is also evidence that this delay harmed Zavala. A jury could conclude that if not for this delay, Zavala would have received timely wound care—such as removal of stitches, wound cleaning, and a change of bandages—because that type of care is typically provided during "routine follow-ups with the surgeon." [144] at 7

14

(sealed). As discussed below, a jury could conclude that Zavala's failure to receive timely wound care prolonged his serious physical pain. The delay in sending Zavala out for a follow-up appointment might not have harmed Zavala if Zavala had received timely and appropriate follow-up care at Wexford in the interim, *cf*. [143] at 15 (sealed) (noting Wexford policy required regular wound cleaning and dressing changes), but he did not. Accordingly, a jury could conclude that the delay in sending Zavala to a follow-up with Dr. Weinzweig prolonged Zavala's serious pain.

Defendants again argue that Zavala has not presented evidence that Dr. Obaisi was responsible for any delays, deliberately refused to send Zavala offsite, or failed to do what he personally could have. As noted above, defendants argue, for example, that Zavala did not present evidence that Dr. Obaisi was personally responsible not just for medical evaluations of patients but also for scheduling offsite appointments and / or coordinating security transport. [177] at 7. With respect to Dr. Weinzweig, defendants point to the fact that Dr. Obaisi in fact sought and obtained approval for all visits with Dr. Weinzweig through January 31, 2017, and contend that there is no basis that Dr. Obaisi would have done this and then consciously failed to send Zavala out for an appointment due to a performance review. [177] at 6–7. As with the arguments regarding the evaluation by Ms. Southworth, defendants are free to present these arguments to the jury, but at this stage the evidence of Dr. Obaisi's awareness of Zavala's condition and participation in collegial review is enough to survive summary judgment.

### c. Delay in Adequate Splinting

As discussed above, the day after Zavala's surgery, Dr. Weinzweig prescribed Zavala a custom, thermoplastic splint to wear for a period of six to eight weeks following surgery. Dr. Weinzweig reiterated this requirement in Zavala's post-operative visit one week later. Dr. Obaisi complied with this prescription by ordering a thermoplastic splint, but due to IDOC security policies, Zavala was not allowed to use it outside the infirmary. Dr. Obaisi never told Zavala either that the thermoplastic splint existed or that Zavala could use it in the infirmary. Whether Zavala would have been allowed to use the thermoplastic splint in the infirmary is a disputed fact issue. Defendants contend that Dr. Obaisi attempted to have IDOC allow Zavala to use the thermoplastic splint in the infirmary, and that the request was denied by IDOC. But there is testimony in the record indicating that Zavala would have been allowed to use it there. Thus, a jury could conclude that Zavala's hand was not splinted when it could and should have been.

Dr. Obaisi eventually requested an alternate security-compliant brace, but not until January 3, over a month after the thermoplastic splint was initially denied by IDOC on November 22. There is some evidence in the record to support Zavala's argument that there was nothing stopping Dr. Obaisi from obtaining an alternate brace as soon as IDOC denied the thermoplastic splint. Z's Resp. OSOF [159] ¶¶ 18,

29; ZSOF [159] 21; [142] at 19 (sealed). As with the other delays, there are issues of fact precluding summary judgment on whether this unexplained delay was a product of deliberate indifference by Dr. Obaisi.

There is evidence that this delay harmed Zavala. Dr. Levitz testified that timely use of a splint is important for tendon injuries and that Zavala experienced increased discomfort, swelling, and pain because he was not placed in a splint for over a month after his surgery. ZSOF, [159] ¶¶ 20–23. If a jury believes this testimony, it could find that Dr. Obaisi's delay exacerbated Zavala's injury and prolonged his pain. *Cf. King v. Chapman*, 4 F. Supp. 3d 1017, 1039–40 (N.D. Ill. 2013) (denying summary judgment where physician's "delay in following surgeon's advice in obtaining" a medical device "and physical therapy constituted deliberate indifference"), *rev'd in part on other grounds sub nom. King v. Newbold*, 815 F. App'x 82 (7th Cir. 2020).

### d. Delay in Wound Care

Zavala's sutures were not removed for eight weeks following his surgery, which Dr. Levitz testified can be painful because sutures "tend to grow into the skin," sometimes causing a burning sensation. ZSOF, [159] ¶¶ 29, 32. Zavala's dressings were not changed or cleaned until at least December 9, 2016—over a month after his surgery—which Dr. Levitz testified "can be extremely uncomfortable." ZSOF, [159] ¶¶ 27–28.

Obaisi emphasizes that Dr. Weinzweig did not observe "any signs of infection" resulting from the lack of wound care and that the lack of wound care did not delay Zavala's healing process. [122] at 9. These arguments, even if correct, do not preclude liability. Again, "deliberate indifference to prolonged, unnecessary pain can itself be the basis for an Eighth Amendment claim." *Smith*, 666 F.3d at 1040. Zavala filed written complaints indicating that he repeatedly complained to Dr. Obaisi about severe pain in his hand, and specifically connected this pain to his wound care. *See, e.g.*, ZSOF, [159] ¶ 31 (alleging that "Zavala showed his wound to Dr. Obaisi . . . including his retained stitches," and Dr. Obaisi responded only by providing band-aids); ZSOF, [159] ¶ 34 (alleging that Zavala told Dr. Obaisi "My fingers hurt bad from these stitches. . . . My fingers are numb, and feel frozen stiff."). In addition, Dr. Levitz testified that, notwithstanding the delayed therapy and follow-ups, the lack of wound care probably independently contributed to Zavala's discomfort and pain. ZSOF, [159] ¶¶ 25, 28; [144] at 24 (sealed). Obaisi contends that while Dr. Levitz testified that unclean bandages can be uncomfortable, Dr. Levitz admitted that he has seen no evidence that this actually occurred in this case. O's Resp. ZSOF, [176] ¶ 28. However, Zavala's written

complaints and Dr. Levitz's testimony considered in its entirety foreclose summary judgment.

* * *

For the reasons explained above, the record indicates genuine, material disputes about whether Dr. Obaisi was deliberately indifferent to Zavala's medical needs and, if so, whether the delays attributable to Dr. Obaisi's indifference harmed Zavala. Summary judgment on these issues is denied.

### 3. Punitive Damages

Obaisi, the executor of Dr. Obaisi's estate, argues that punitive damages are not available against the estate. Federal common law governs the scope of punitive damages in § 1983 actions. *See Erwin v. County of Manitowoc*, 872 F.2d 1292, 1299 (7th Cir. 1989). In such actions, a jury may assess punitive damages if the plaintiff shows that a defendant's conduct was "motivated by evil motive or intent" or involved "reckless or callous indifference to the federally protected rights of others." *Green v. Howser*, 942 F.3d 772, 781 (7th Cir. 2019) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)). The standard for awarding punitive damages tracks the standard for § 1983 liability generally—both require that the defendant acted with deliberate indifference. *Woodward v. Corr. Med. Servs. of Ill.*, 368 F.3d 917, 930 (7th Cir. 2004). Punitive damages serve three purposes: specific deterrence (that is, deterrence of the defendant himself), general deterrence (deterrence of other state actors who are similarly situated to the defendant), and punishment. *See Smith*, 461 U.S. at 54 (punitive damages exist "to punish the defendant for his outrageous conduct and to deter him and others like him from similar conduct in the future") (citation and quotation marks omitted).

"[F]ew courts, however, have decided on whether punitive damages may be assessed against § 1983 defendants who are deceased." *Heidelberg v. Manias*, No. 18-cv-1161, 2020 WL 7034315, at *25 (C.D. Ill. Nov. 30, 2020). Most of the district courts in this circuit considering this question have held that they may not. *See Heidelberg*, 2020 WL 7034315, at *24–25; *Flournoy v. Estate of Obaisi*, No. 17-cv-7994, 2020 WL 5593284, at *14 (N.D. Ill. Sept. 18, 2020); *Kahlily v. Francis*, No. 08-cv-1515, 2008 WL 5244596, at *6 (N.D. Ill. Dec. 16, 2008). These courts reasoned that imposing punitive damages on deceased defendants would not serve two of the three purposes of punitive damages—specific deterrence and punishment. As *Kahlily* explained:

> Although imposing punitive damages in such situations could provide deterrence to other officers, other forms of deterrence already exist to prevent state officials from committing constitutional torts. Other principles, such as the interest in avoiding liability for compensatory

17

damages and the devotion to public duty, operate to deter state officials from engaging in the type of conduct that can give rise to liability for punitive damages. *See Smith*, 461 U.S. at 50. Whatever incremental deterrence value imposing punitive damages on deceased defendants would have on others does not outweigh the fact that two of the major purposes for imposing punitive damages would not be served at all. Because imposing punitive damages on the estate of a deceased defendant cannot punish or deter the individual that engaged in the outrageous conduct, awarding punitive damages in such situations would not serve the overall policies behind punitive damages.

*Kahlily*, 2008 WL at *6; *see also Doe v. Indyke*, 465 F. Supp. 3d 452, 472 (S.D.N.Y. 2020) ("[T]he general deterrence purpose of punitive damages . . . is served by the availability of punitive damages against defendants who are alive.").

The minority of courts within this circuit that reached a contrary decision did so based on *Graham v. Sauk Prairie Police Commission*, 915 F.2d 1085 (7th Cir. 1990). In *Graham*, the widow of a man shot and killed by a police officer brought a § 1983 suit against the officer; the officer died shortly after the suit was brought. *Id.* at 1088. The Seventh Circuit allowed the plaintiff to seek loss-of-life damages against the deceased officer's estate, explaining:

Section 1983 damages are considered to be appropriate as long as those damages generally effectuate the policies underlying § 1983. The fundamental policies underlying § 1983 are compensation for, and deterrence of, unconstitutional acts committed under state law. . . .

The fact that Mueller [the deceased officer] can no longer be deterred is quite irrelevant. The deterrence objective of § 1983 damages is directed at a broader category of persons than the individual perpetrator alone.

*Id.* at 1104–05 (citations omitted). Drawing on this reasoning, some courts have concluded that if general deterrence is enough to justify the award of loss-of-life damages, it must also be sufficient to justify the award of punitive damages. *See Javier v. City of Milwaukee*, No. 07-cv-0204, 2009 WL 10663364, at *8–9 (E.D. Wis. Dec. 23, 2009); *Estate of Arana v. City of Chicago*, No. 89-cv-4179, 1992 WL 162965, at *2 (N.D. Ill. July 2, 1992).

But punitive damages serve unique purposes. Unlike other forms of damages, including the loss-of-life damages at issue in *Graham*, "[p]unitive damages by definition are not intended to compensate the injured party, but rather to punish the tortfeasor." *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 266 (1981); *see also Graham*, 915 F.2d at 1106 (emphasizing "the compensatory aspect of loss of life damages"). Thus, while two of the three policy goals at issue in *Graham*

were furthered by the award of loss-of-life damages (general deterrence and compensation would be furthered; specific deterrence would not), the opposite is true when it comes to punitive damages (general deterrence would be furthered; specific deterrence and punishment would not).

The court agrees with the reasoning in *Heidelberg*, *Flournoy*, and *Kahlily*. Obaisi's motion for summary judgment on the issue of punitive damages is granted.

### B.  Wexford's Summary Judgment Motion

Zavala contends that Wexford shares responsibility for his injuries. While Wexford is a private corporation, "the *Monell* theory of municipal liability applies in § 1983 claims brought against private companies that act under color of state law." *Whiting*, 839 F.3d at 664 (citations omitted) (describing *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978)). Because Wexford "has contracted to provide essential government services" (medical care), Wexford is "subject [under § 1983] to at least the same rules that apply to public entities." *Hildreth v. Butler*, 960 F.3d 420, 426 (7th Cir. 2020) (quoting *Glisson v. Dep't of Corr.*, 849 F.3d 372, 378–79 (7th Cir. 2017) (en banc) (alterations in *Hildreth*)).

In order to defeat summary judgment on his *Monell* claim against Wexford, Zavala must present evidence from which a jury could find that Wexford's policy or custom caused his injury. *Spiegel v. McClintic*, 916 F.3d 611, 617 (7th Cir. 2019). He can satisfy this burden by showing one of three things: (1) a policy that Wexford's officers officially promulgated; (2) a widespread practice that was so permanent and well-settled that it constituted a custom or practice despite not being expressly adopted; or (3) that a person at Wexford with final policymaking authority caused the constitutional injury. *Id*.

Here, Zavala does not allege that any person with final policymaking authority caused his injury. Nor does Zavala argue—at least not explicitly—that Wexford officially promulgated an unconstitutional policy. Although Zavala points to language in Wexford's contract with the State of Illinois that arguably incentivizes cost-cutting practices, *see* [164] at 6–8 (citing language requiring Wexford to "aggressively manage all off-site services for . . . cost effectiveness" and, in some cases, to pay for offsite referrals out of Wexford's own profits), Zavala does not appear to argue that Wexford officially codified these practices into formal company policies, and there is no evidence in the record to support such an inference.

To the extent Zavala's brief could be interpreted as arguing that the contractual language *itself* amounts to an unconstitutional Wexford policy, that argument is not persuasive. Even assuming that contractual language amounts to an "official policy" actionable under *Monell* (an assumption that may be incorrect),

the contractual provisions Zavala cites do not condone prioritizing cost-cutting over proper medical care or reasonable medical judgment.  Indeed, as Zavala concedes, the contract explicitly "requires Wexford to provide care that meets medically accepted community standards." [164] at 6.

This leaves a "custom or practice" claim.  To prevail on a custom or practice claim, Zavala must show that Wexford's practices violated his constitutional rights and that each alleged practice was "so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision." *Hildreth*, 960 F.3d at 426 (citation and quotation marks omitted).  "This requires more than a showing of one or two missteps.  There must be systemic and gross deficiencies." *Id.* (citations and quotation marks omitted).  Zavala must also show that Wexford's policymakers knew about and failed to correct the practice, *id.* at 426, and that Wexford's conduct was the "moving force" behind his injury, *J.K.J. v. Polk Cty.*, 960 F.3d 367, 377 (7th Cir. 2020) (en banc).  In other words, Zavala must demonstrate a direct causal link between Wexford's conduct and his injury.  *Id.*

It is "difficult," but "not impossible," for a plaintiff to show a widespread custom or policy based solely on his own experience.  *Hildreth*, 960 F.3d at 426 (citation and quotation marks omitted).   "[W]hat is needed is evidence that there is a true municipal policy at issue, not a random event." *Phelan v. Cook County*, 463 F.3d 773, 790 (7th Cir. 2006), *overruled on other grounds by Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016) (quoting *Calhoun*, 408 F.3d 375, 380 (7th Cir. 2005)).  The Seventh Circuit "has not adopted any bright-line rules defining a widespread practice or custom," but has "acknowledged that the frequency of conduct necessary to impose *Monell* liability must be more than three," as well as acknowledged its prior explanation in *Grieveson v. Anderson*, 538 F.3d 763 (7th Cir. 2008), that (on the facts of *Grieveson*) "evidence of four instances that [plaintiff] alone experienced is simply not enough to foster a genuine issue of material fact that the practice was widespread." *Hildreth*, 960 F.3d at 427–28 & n.6 (citations and quotation marks omitted).

Here, Zavala alleges that Wexford maintained two unlawful widespread practices: (1) prioritizing cost-cutting above proper medical care and (2) tolerating, condoning, or encouraging delays.  As explained below, there is not enough evidence on either point to withstand Wexford's motion for summary judgment.

First, Zavala's examples of Wexford prioritizing cost-cutting "are insufficiently numerous" to survive summary judgment.  *Hildreth*, 960 F.3d at 426. Zavala has offered evidence of several deficiencies in medical care, but he has offered evidence that could allow a jury to tie at most two of those deficiencies—the denial of a timely follow-up visit with Dr. Weinzweig and timely occupational therapy with Ms. Southworth—to Wexford's prioritizing cost-cutting.  Both Dr. Weinzweig and Ms. Southworth are outside providers—that is, providers located

outside Stateville—and there is evidence in the record indicating that it cost Wexford extra money to send inmates to see outside providers vis-à-vis in-house providers. *See* ZSOF [162] at ¶¶4–12, 20–23. Thus, there is a basis on which a jury could find that the delays in these two outside referrals were motivated in part by Wexford's desire to cut costs.

But there is no evidence in the record that plausibly links other delays or deficiencies to a desire by Wexford to save money. The denial of Zavala's thermoplastic splint (which had already been purchased) was caused by IDOC security policies, not by Wexford. And Zavala has not put forward any evidence suggesting that the remaining delays—delays in obtaining a security-compliant brace, in beginning physical therapy with Stateville's on-site physical therapist, or in receiving wound care (such as clean dressings and suture removal) that could have been provided by Stateville's on-site physicians—served any cost-saving purpose. *Cf. Montague v. Wexford Health Sources, Inc.*, 615 F. App'x 378, 379 (7th Cir. 2015) (explaining that delaying approved medical treatment is often not financially advantageous because "unwarranted delay in obtaining medical assistance leads to medical complications that drive up the eventual cost"). As in *Hildreth* and *Grieveson*, "'evidence of four incidents that [plaintiff] alone experienced' is 'simply not enough to foster a genuine issue of material fact that the practice was widespread.'" *Hildreth*, 960 F.3d at 427 (quoting *Grieveson*, 538 F.3d at 774–75) (brackets in *Hildreth*).

Zavala's allegation that Wexford impermissibly condoned delays in medical treatment likewise does not withstand summary judgment. Zavala's briefs contend that he experienced four such delays: delays in (1) sending Zavala for a timely follow-up appointment with Dr. Weinzweig; (2) sending Zavala to his initial occupational therapy consultation; (3) providing Zavala with wound care; and (4) providing Zavala with a splint. Zavala has "not provided evidence that any other inmates experienced" similar delays. *Hildreth*, 960 F.3d at 427. Again, under *Hildreth*, this is "insufficient to qualify as a widespread practice or custom." *Id.* at 428 & n.6.

Furthermore, Section 1983 claims that are based on a policy of inaction, such as Zavala's delay claim, *see* [164] at 11, require the plaintiff to "present evidence that the institution made a conscious decision not to act." *Walker*, 940 F.3d at 966. Here, Wexford approved Dr. Obaisi's requests for follow-up appointments and for the sole requested occupational therapy consultation. Zavala argues that, despite this approval, Wexford knew or should have known that the referrals had been delayed based on Zavala's December 1 and December 28 grievances. But even

assuming that were the case, two instances are "insufficiently numerous" to survive summary judgment. *Hildreth*, 960 F.3d at 426.

Wexford's motion for summary judgment is granted.

## Conclusion

Defendants' *Daubert* motion [130] is denied. Obaisi's motion for summary judgment [122] is granted in part and denied in part. Wexford's motion for summary judgment [126] is granted.

Date: March 29, 2021        <u>/s/ Martha M. Pacold</u>